UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

| | | |
|---|---|---|
| LIBERTY CASH BRILEY, | : | CIV. 12-4169 |
| Plaintiff, | : | |
| vs. | : | |
| DOUG WEBER, Warden, South Dakota State Prison; and ROBERT DOOLEY, Warden, Mike Durfee State Prison, | : : : | **DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS** |
| Defendants. | : | |
| | : | |

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

Defendants Doug Weber and Robert Dooley offer this Statement of Undisputed

Material Facts in support of their Motion for Summary Judgment pursuant to SDCL §

15-6-56(c)(1).

**A.     Parties, claims, and defenses**.

1.     Plaintiff Liberty Cash Briley was an inmate at the Mike Durfee State Prison

in Springfield, South Dakota when he initiated this civil rights action complaining about

the conditions of his confinement.  (Doc. 1.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

2.      Briley was released on parole on March 25, 2013 and was returned to the

South Dakota State Penitentiary on September 10, 2013.  His new parole date is

unknown.  He was sentenced for three new counts of forgery and two theft counts.  (*See*

Weber Aff., ¶ 3, Ex. H.)

3.      Briley filed a complaint against Wardens Doug Weber and Robert Dooley

and the South Dakota State Prison and Mike Durfee State Prison.  (Doc. 1.)  The Court

previously dismissed the South Dakota State Prison and Mike Durfee State Prison, as they

are not "persons" under 42 U.S.C. § 1983.  (Doc. 22.)  He later filed an Amended

Complaint against only Wardens Doug Weber and Robert Dooley.  (Doc. 36.)

4.      Briley did not specify in either his original or amended complaint whether

he is suing Weber and Dooley in their individual or official capacities.  (Doc. 1.)

5.      Doug Weber was employed by the South Dakota Department of Corrections

as the Director of Prison Operations and Chief Warden at the South Dakota State

Penitentiary until his retirement on June 7, 2013.  Darin Young is the current Warden at

the South Dakota State Penitentiary.  (Weber Aff., ¶ 2.)

6.      Robert Dooley is employed by the South Dakota Department of Corrections

(DOC) as Warden of the Mike Durfee State Prison (MDSP).  (Dooley Aff., ¶ 2.)

7.      The Court screened Briley's original Complaint and allowed Briley to

proceed with the following two claims: (1) an Eighth Amendment claim based on

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

Briley's allegation that he contracted Hepatitis C as a result of his housing assignment with former inmate S.S.; and (2) an Eighth Amendment deliberate-indifference claim based on Briley's allegation that he has not received adequate treatment for his Hepatitis C.  (Doc. 6.)

8.     Briley originally requested as relief that Defendants "give me treatment or be financial responsible for treatment upon Release from Prison 3-25-13, compensatory and punitive damages in the amount of 10,000,000.00 ten million dollars."  (Doc. 1.)

9.     Given Briley's release, Defendants filed a motion to dismiss Briley's claims for prospective relief.  (Doc. 27.)

10.     Briley's Amended Complaint does not state a claim for prospective relief. Briley now requests as relief compensatory and punitive damages.  (Doc. 36.)

**B.     Administrative remedy process.**

11.     The administrative-remedy policy implemented by the DOC and followed by the SDSP and MDSP requires that an inmate follow a two-step process to present complaints concerning the application of any administrative directive, policy, or unit rule or procedure.  (Weber Aff., ¶ 4, Ex. A.)

12.     First, the inmate must file an informal resolution request.  Second, if the issue is not resolved, the inmate must, within five days of the response to the informal resolution request, file a request for administrative remedy.  (*Id*.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

13. Briley filed an informal resolution request on July 23, 2012, about his cell assignment with S.S. Briley alleged that he lived with S.S. while incarcerated at the SDSP. He further alleged that he "was required to take care of him and clean up after him." According to Briley's initial grievance, S.S. later died from Hepatitis. Briley indicated that he tested positive for Hepatitis C on July 16, 2012, and believed that he contracted Hepatitis while he lived with and cared for S.S. Briley requested treatment for his Hepatitis. (Weber Aff., ¶ 6, Ex. B.)

14. A member of Briley's unit staff received his initial grievance and contacted Correctional Health Services regarding Briley's request for Hepatitis treatment. After speaking with health services, prison staff told Briley that "you will receive treatment based on protocol set up by medical. Blood tests will determine when that happens. Any further questions can be asked of medical staff at designated times." (Weber Aff., ¶ 6, Ex. B.)

15. Briley filed another informal resolution request regarding his cell assignment with S.S. on July 24, 2012. Briley alleged that his due process was violated when he was not provided information or tools necessary to protect himself while living with another inmate who had a contagious disease. He again alleged that S.S. gave him Hepatitis. Briley requested compensation for "past and future harm and expenses." (Weber Aff., ¶ 6, Ex. B.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

16.     A member of Briley's unit staff contacted health services and responded to
Briley's grievance that when he requested the Hepatitis test, he told health services that he
wanted the test because of his prison tattoos.  Briley did not tell health services when he
requested the Hepatitis test that he had contact with infected body fluid while
incarcerated. (Weber Aff., ¶ 6, Ex. B.)

17.     Briley did not file a request for administrative remedy, the second step in
the grievance process, regarding his allegation that he contracted Hepatitis as a result of
his cell assignment with S.S.  (Weber Aff., ¶ 6, Ex. B.)

18.     Briley filed a request for administrative remedy on July 31, 2012, regarding
his Hepatitis treatment only.  He did not allege in his request for administrative remedy
that he contracted Hepatitis due to his cell assignment with S.S.  Briley argued that "Dr.
Hanvey told me I would not receive treatment because I had to [sic] short of sentence.  I
don't feel that is the proper way to handle this matter.  I would like to be able to talk to
the head Dr. and find out when I can start treatment."  (Weber Aff., ¶ 6, Ex. B.)

19.     The administrative remedy coordinator assigned L. Schryvers to investigate
Briley's request and prepare a response for Warden Robert Dooley's review.  Warden
Dooley signed a response on August 24, 2012.  The response informed Briley that he
would be "scheduled with Dr. Wallinga in the next few weeks to discuss your medical
condition."  (Weber Aff., ¶ 6, Ex. B.; Dooley Aff., ¶ 10, Ex. A.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

20.     In his response to the Court's scheduling request, Briley raised an issue regarding his mental-health medication.  (Doc. 18.)

21.     On November 20, 2012, Briley filed an informal resolution request, complaining that he was not receiving his mental health medication because he feared leaving his cell area to obtain his medication.  He stated, "I feel I'm unable to go and get my medication due to safety and harm that may happen to my life. . . ."  Briley requested as relief that his mental health medication be made available without putting himself in a dangerous position by being assaulted by other inmates.  (Weber Aff., ¶ 6, Ex. B.)

22.     Prison staff spoke with special security and responded to Briley's grievance. Prison staff told Briley that the issue had previously been discussed with him, and he was expected to go to medication pass to receive his medications.  (Weber Aff., ¶ 6, Ex. B.)

23.     Briley did not file a request for administrative remedy regarding his mental health medications.  (Weber Aff., ¶ 6, Ex. B.)

24.     According to the administrative grievances in Briley's institutional file, Briley failed to exhaust his administrative remedies under the DOC administrative remedy policy for his claims that he contracted Hepatitis C as a result of his cell assignment or that staff have refused his mental health medications.  (Weber Aff., ¶ 6, Ex. B.)

25.     Briley exhausted his administrative remedies for his claim challenging the treatment he has received for his Hepatitis C.  (Weber Aff., ¶ 6, Ex. B.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

26.     Briley filed a separate lawsuit with this Court, Civ. 12-4210, about his access to mental-health medications.  (*See* Civ. 12-4210, Doc. 1.)

**C.     Briley's housing assignment.**

27.     During Briley's incarceration, he had numerous changes in his cell assignment.  (Weber Aff., ¶ 16, Ex. E.)

28.     On March 23, 2011, Briley started sharing a cell with inmate S.S.  The inmates shared cell N-02, located on the north wing of the South Dakota State Penitentiary.  (Weber Aff., ¶ 16, Exs. D, E.)

29.     Housing assignments are made by unit managers in accordance with DOC policies and SDSP operational memoranda, and with the involvement of special security in some cases.   (Weber Aff., ¶ 7.)

30.     Neither Warden Weber nor Warden Dooley is involved in making inmate housing assignments.  (Weber Aff., ¶ 7; Dooley Aff., ¶ 4.)

31.     Unit Manager Clifton Fantroy assigned Briley cell N-02 after Briley requested the move.  According to Fantroy's recollection, Briley requested the move because he was not feeling well, and he would avoid some stairs if he moved to cell N-02. (Weber Aff., ¶ 8; Fantroy Aff., ¶ 4.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

32.    On April 14, 2011, Briley and S.S. were moved from cell N-02 to cell S-23, located on the south wing of the South Dakota State Penitentiary.  (Weber Aff., ¶ 16, Exs. D, E.)

33.    S.S. moved from cell S-23 to the infirmary on April 27, 2011.  (Weber Aff., ¶ 16, Ex. D.)

34.    Briley and S.S. shared a cell for a little over one month, between March 23, 2011 and April 27, 2011.  (Weber Aff., ¶ 16, Exs. D, E.)

35.    Briley did not voice any concerns between March 23, 2011 and April 27, 2011, to either Weber or Fantroy regarding his cell assignment with S.S.  (Fantroy Aff., ¶ 5; Weber Aff., ¶¶ 14, 17.)

36.    Warden Weber did not ask Briley to care for S.S. while they shared a cell. (Weber Aff., ¶ 17.)  Briley did not tell Weber that S.S. was acting in a way that would threaten him with exposure to Hepatitis C.  (*Id.*)

**D.    Hepatitis C.**

37.    Hepatitis C is a liver disease that ranges in severity from a mild illness lasting a few weeks to a serious, lifelong illness that attacks the liver.  (Wallinga Aff., ¶ 5.)

38.    Hepatitis C results from infection with the Hepatitis C virus (HCV), which is spread primarily through contact with the blood of an infected person.  Hepatitis C is

usually spread when blood from a person infected with the Hepatitis C virus enters the body of someone who is not infected.  People may become infected with the Hepatitis C virus by sharing needles or through blood transfusions and organ transplants.  (Wallinga Aff., ¶ 6.)

39.     Less commonly, a person can also get Hepatitis C virus infection through sharing personal care items that may have come in contact with another person's blood, such as razors or toothbrushes or having sexual contact with a person infected with the Hepatitis C virus.  (Wallinga Aff., ¶ 7.)

40.     Hepatitis C can be either "acute" or "chronic."  Acute Hepatitis C virus infection is a short-term illness that occurs within the first 6 months after someone is exposed to the Hepatitis C virus.  Chronic Hepatitis C virus infection is a long-term illness that occurs when the Hepatitis C virus remains in a person's body.  (Wallinga Aff., ¶ 8.)

41.     Not all persons infected with Hepatitis C exhibit symptoms.  The most common early symptoms are mild fever, headache, muscle aches, fatigue, loss of appetite, nausea, vomiting and diarrhea.  Later symptoms may include dark coffee-colored rather than dark yellow urine, clay-colored stools, abdominal pain, and yellowing of the skin and/or whites of the eyes (jaundice).  (Wallinga Aff., ¶ 9.)

**E.     Briley's contraction of Hepatitis C.**

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

42.     When an inmate begins his incarceration, intake staff document the incoming inmates existing scars, marks or tattoos for identification purposes if the inmate escapes and to determine whether the inmate obtains any new tattoos during his incarceration, which is prohibited.  (Weber Aff., ¶ 18, Ex. G.)

43.     The intake staff take photos of the existing tattoos and advise the inmate to disclose all tattoos, because any tattoos found during incarceration that are not documented will be considered new tattoos.  (*Id.*)

44.     When Briley started his incarceration, he had a cross tattoo on his left upper arm and a buffalo skull on his right upper arm.  (*Id.*)

45.     On May 10, 2012, an inmate informed prison staff that Briley had been stealing tattoo materials, such as alcoholic pads and lotion, from the infirmary.  Prison staff reviewed the camera footage from the infirmary and observed Briley putting something in his sock and pants.  (Weber Aff., ¶ 19, Ex. H.)

46.     Prison staff issued a disciplinary report on May 10, 2012, charging Briley with committing prohibited act 4-9, stealing.  (Weber Aff., ¶ 19, Ex. H.)

47.     On December 5, 2012, prison staff inspected Briley for any new tattoos. Prison staff observed the following tattoos: (1) left forearm had a tattoo stating, "COWBOY"; (2) right forearm had a tattoo stating, "In loving memory of Michael G Briley", with an anchor that says "TCB" down the middle and a mermaid next to the

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

anchor; (3) back had a tattoo of a Bronc Rider, stating "In loving memory of Frank Bud

Hall"; (4) left arm had a cross tattoo, as documented on the adult photo database during

his prison admission; and (5) right arm had a skull tattoo, as documented on the adult

photo database during his prison admission.  (Weber Aff., ¶ 19, Ex. H.)

48.    Officer Kracht noted that one of the new tattoos that was not documented

on during admission was located within inches of the documented tattoo.  The staff

member taking pictures of the Briley's tattoos upon admission likely could not have

missed the second tattoo.  (Weber Aff., ¶ 19, Ex. H.)

49.    On December 5, 2012, prison staff issued a disciplinary report for Briley,

charging him with committing prohibited act 3-20, having a new tattoo.  Prison staff

explained that Briley had three new tattoos that were not documented upon admission.

(Weber Aff., ¶ 19, Ex. H.)

50.    On June 13, 2012, Briley requested HIV, Hepatitis B, and Hepatitis C

testing.  He told the nurse he wanted this testing performed because he had several prison

tattoos.  (Wallinga Aff., ¶ 3, Ex. A1.)

51.    Briley also requested Hepatitis and HIV testing during his medical

appointment on June 19, 2012, with Physician's Assistant Michael Joe Hanvey.  Briley

told Hanvey that he wanted Hepatitis and HIV testing due to "prison tattoos while

incarcerated."  (Wallinga Aff., ¶ 3, Ex. A11.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

52.      Before testing occurred, Briley completed a consent form and AIDS

questionnaire.  In his questionnaire answers, he stated that he had never had Hepatitis B

or C.  On May 7, 2010, Briley's blood tests showed that he tested positive for Hepatitis B

antibody, but negative for the Hepatitis C antibody.  (Wallinga Aff., ¶ 3, Ex. A3-4.)

53.      Briley also stated through his answers to the AIDS questionnaire that he had

received a blood transfusion, had sex with a prostitute, had been raped, and has had a

sexually transmitted disease.  (Wallinga Aff., ¶ 3, Ex. A3.)

54.      The questionnaire form specifically provides that the inmate's answers will

be kept confidential and will not be shared with other inmates.  The form also states, "[i]f

you are tested for AIDS and the test is positive, your fellow inmates **will not** be told the

test results."  (Wallinga Aff., ¶ 3, Ex. A3 (emphasis in original).)

55.      Briley had HIV, Hepatitis B, and Hepatitis C blood testing performed on

June 22, 2012.  (Wallinga Aff., ¶ 3, Ex. A2, 5.)

56.      Briley tested positive for the antibody to Hepatitis C virus.  (Wallinga Aff.,

¶ 3, Ex. A5.)

## F.      Hepatitis C treatment.

57.      People with chronic Hepatitis C should be monitored regularly for signs

of liver disease and evaluated for treatment.  Drug therapy treatment is also available,

which most often includes a combination of two medicines, Interferon and Ribavirin.

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

However, not every person with chronic Hepatitis C needs or will benefit from drug

therapy treatment.  (Wallinga Aff., ¶ 11.)

58.     The South Dakota Department of Health Correctional Health Services has

created a Hepatitis C biopsy eligibility checklist to determine who is eligible for and

would benefit from a liver biopsy and subsequent Hepatitis C drug therapy treatment.

The only Department of Health approved medications for treatment of Hepatitis C are

Pegasys Interferon injections and oral Ribavirin.  (Wallinga Aff., ¶ 10, Ex. B.)

59.     Interferon is injected under the skin three times a week and can cause

fatigue, aching, headache, loss of appetite, weight loss, difficulty sleeping, anxiety,

irritability, and depression, which could be so severe as to cause suicide.  Interferon can

also lower white blood cells and platelets, causing thyroid problems, heart problems, and

worsening of liver disease.  (Wallinga Aff., ¶ 14.)

60.      Ribavirin is a pill that must be taken two times a day.  This medication can

breakdown red blood cells, resulting in anemia.  Ribavirin can also cause skin rash,

itching, shortness of breath, cough, sore throat, nasal congestion, stomach pain, and loss

of appetite.  (Wallinga Aff., ¶ 15.)

61.     The Interferon and Ribavirin drug therapy must be provided continuously

for forty-eight weeks.  Post-drug therapy follow-up treatment is also necessary.  The side

effects of Interferon and Ribavirin can be severe and cause death.  During treatment,

frequent blood tests are necessary.  The complete treatment, medical follow-up,

psychiatric and psychological follow-up, and laboratory testing must be followed.

Interruptions with the drug therapy can cause serious side effects.  (Wallinga Aff., ¶ 16.)

62.     There is no guarantee that treatment will eliminate the Hepatitis C virus or

prevent cirrhosis or liver cancer.  Most people with Hepatitis C infection do not develop

significant liver disease, even after twenty or more years of infection.  (Wallinga Aff., ¶

12.)

63.     The Department of Health's policy is to offer treatment only if: (1) the

inmate has progressive permanent liver disease present on a liver biopsy; (2) the inmate

has time remaining to be served greater than the usual treatment and follow-up period

(usually 18 months); (3) the inmate is drug and alcohol free, as determined by random

testing during the period before and during treatment, and has satisfactorily completed

Chemical Dependency treatment if the inmate is chemically dependant; and (4) the inmate

has no other medical conditions (including recent or serious mental illnesses) that are

contraindicated.  (Wallinga Aff., ¶ 10, Ex. B.)

64.     The Department of Health may also require assurances from an inmate that

he or she will cooperate with treatment procedures if the inmate has a history of poor

cooperation with medical, psychiatric, or mental health treatment or evaluation.

(Wallinga Aff., ¶ 10, Ex. B.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

65.     Neither Warden Weber nor Warden Dooley provides medical care to inmates.  They do not interfere with the medical care prescribed by the medical professionals charged with the responsibility of providing medical care for inmates.  The medical professionals with Correctional Health Services follow the policies and protocol established by the Department of Health, and neither Warden Weber nor Warden Dooley is involved with creating Department of Health policies or protocol for inmates' Hepatitis C treatment.  (Weber Aff., ¶¶ 20-21; Dooley Aff., ¶¶ 6-7.)

**G.     Briley's Hepatitis treatment.**

66.     Correctional Health Services performed laboratory testing for Briley's liver on July 6, 2012.  Briley's liver enzymes were normal.  (Wallinga Aff., ¶ 3, Ex. A12.)

67.     Briley treated with physician's assistant Mark Steil, who provides mental health care, on July 19, 2012, before his appointment with his physician's assistant regarding his Hepatitis C test results.  Briley told Steil that he cared for an individual at the Sioux Falls prison who had end stage liver disease secondary to Hepatitis C.  Briley complained that he did not know the other inmate had Hepatitis C.  Briley denied any other exposure in the past, such as needle exchange or any other high risk factors for Hepatitis C.  Steil noted that Briley's most recent chemistry panel revealed normal liver enzymes.  (Wallinga Aff., ¶ 3, Ex. A13-14.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

68.     Briley initiated chronic care for his Hepatitis C on July 19, 2012.  During

his initial appointment on July 19, 2012, Briley told his treating physician's assistant Joe

Hanvey that he had no history of blood transfusion or intravenous drug use.  He reported

assisting a Hepatitis C inmate while incarcerated in Sioux Falls, but denied any blood or

body fluid exposure.  (Wallinga Aff., ¶ 3, Ex. A12.)

69.     Hanvey reviewed Briley's July 6, 2012 lab results showing normal enzyme

levels.  Hanvey enrolled Briley in chronic care for Hepatitis C.  Under the chronic care

Hepatitis C treatment, Correctional Health Services checks Briley's livery enzyme levels

every six months through a liver panel and complete blood count.  (Wallinga Aff., ¶ 3,

Ex. A12.)

70.     Hanvey also ordered Hepatitis C viral load and genotype, and advised

Briley to contact Correctional Health Services if he experienced any problems.  Hanvey

educated Briley regarding motor transmission symptoms of Hepatitis C, as well as

potential treatment options in the future.  (Wallinga Aff., ¶ 3, Ex. A12.)

71.     Hanvey told Briley that he was not qualified for treatment with Pegasys

because Briley would be released from prison within seven months.  Briley also did not

have elevated liver enzymes.  If Briley's liver enzymes were elevated over a six month

period and Briley had sufficient time remaining on his sentence, Briley would have

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

received a liver biopsy and Hanvey would have considered drug therapy treatment

depending on the biopsy results.  (Wallinga Aff., ¶ 3, Ex. A12.)

72.     Briley also suffers from alcohol dependence outside of the prison's

controlled environment.  (Wallinga Aff., ¶ 3, Ex. A6.)

73.     Briley treated with Dr. Mel Wallinga with Correctional Health Services on

August 16, 2012.  Briley told Dr. Wallinga that he cared for an inmate who had severe

Hepatitis C, but there was no known blood exposure.  Briley also told Dr. Wallinga that

he received tattoos while incarcerated.  Briley had questions about Hepatitis C.  (Wallinga

Aff., ¶ 3, Ex. A17.)

74.     Dr. Wallinga gave Briley information regarding Hepatitis C and discussed

how Briley's liver enzymes were currently normal.  Briley's previous liver function tests

were also normal.  Dr. Wallinga recommended followup every four to six months

following his discharge from incarceration.  Dr. Wallinga discussed with Briley a liver

biopsy, possible treatment, and long-term effects of Hepatitis C.  (Wallinga Aff., ¶ 3, Ex.

A17.)

75.     Briley was not previously eligible for drug therapy treatment through

Correctional Health Services, because he was no longer incarcerated (having been

released on March 25, 2013) and his liver enzymes were within normal range.  He would

also need approval from his psychiatrist since he currently has mental health conditions

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

requiring treatment.  He also has a history of substance abuse, for which he would be

subject to random testing.  Finally, Briley has a history of noncompliance with his

psychiatric medications.  He may need to provide assurances that he will cooperate with

the drug therapy treatment before treatment begins.  While Briley just recently returned to

the SDSP, his new parole date is unknown.  (Wallinga Aff., ¶ 10, 17-19, Exs. A1-43, B.)

76.     Despite the fact that Briley's liver enzyme levels do not justify drug therapy

treatment, Correctional Health Services treated Briley's Hepatitis C through regular liver

enzyme monitoring and chronic Hepatitis C care.  (Wallinga Aff., ¶ 18, Ex. A1-43.)

77.     Neither Warden Weber nor Warden Dooley had any direct contact with

Briley about his medical care.  They were not personally involved in his care, did not

discuss his care or medications with his treating physicians, and did not interfere in any

way with the ability of medical personnel to exercise and implement their own medical

judgment on how best to treat Briley.  (Weber Aff., ¶ 22, Dooley Aff., ¶ 7.)

**H.     SDSP segregation policy.**

78.     The SDSP does not automatically segregate inmates who have tested

positive for Hepatitis C.  (Weber Aff., ¶ 9; Wallinga Aff., ¶ 20.)

79.     Unit managers are not generally aware of the inmate's Hepatitis C status

unless Correctional Health Services and the Warden have indicated that the inmate's

medical condition and conduct require separation.  (Weber Aff., ¶ 9.)

01328137.1

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

80.    Even if unit managers know that an inmate has Hepatitis C, unit managers do not advise the inmate's cell mate that the inmate has Hepatitis C.  The inmate's medical condition is kept confidential.  (Weber Aff., ¶ 10.)

81.    Segregation for health reasons occurs on occasion.  But offenders in DOC custody will not be isolated or housed in special units solely because of their medical status, unless determined otherwise by the Correctional Health Services Medical Director and the Warden or Superintendent.  (Weber Aff., ¶ 11, Ex. C; Wallinga Aff., ¶ 21.)

82.    For example, offenders exhibiting disruptive behavior(s), including offenders who make threats to expose individuals to body substances and/or fluids, whose aggressiveness or restiveness results in physical confrontation, who intentionally contaminate their environment with body waste or fluids, who intentionally mutilate themselves, or who were the perpetrator or victim of a sexual assault/rape, may be segregated in accordance with existing disciplinary and administrative segregation procedures.  (Weber Aff., ¶ 12, Ex. C.)

83.    Rather than automatically segregate inmates with Hepatitis C, staff and inmates are advised to practice standard precautions to prevent the transmission of Hepatitis C and other infectious diseases.  (Weber Aff., ¶ 12, Ex. C; Wallinga Aff., ¶ 22.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

84.     Generally speaking, there is no danger or threat of exposure of Hepatitis C by having inmates with Hepatitis C share cells with inmates who do not have Hepatitis C. (Wallinga Aff., ¶ 23.)

85.     Correctional staff consider the safety of inmates when making cell assignments.   There are call buttons in each cell that inmates can press in the case of an emergency.  Inmates are encouraged to notify staff immediately if they feel they are in danger from their cellmate or any other inmate, and staff investigate these reports and can transfer the inmate to ensure his safety.  (Weber Aff., ¶ 15.)

**I.     Inmate S.S.'s medical condition.**

86.     According to inmate S.S.'s medical records, S.S. tested positive for Hepatitis C in 2004.  (Wallinga Aff., ¶ 21, Ex. C1, 4.)

87.     S.S. received treatment for his Hepatitis C during his incarceration, including routine liver function tests.  (Wallinga Aff., ¶ 21, Ex. C81-99.)

88.     S.S.'s liver function tests on April 27, 2011, showed impaired renal function.  S.S. was experiencing confusion, jaundice, and itching.  S.S.'s records do not show that he experienced any vomiting or coughing up blood.  (Wallinga Aff., ¶ 21, Ex. C89-93, 1-147.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

89.     Because S.S.'s April 27, 2011 lab reports showed impaired renal function, medical personnel transferred S.S. to the SDSP infirmary under a sheltered housing status.  (Wallinga Aff., ¶ 21, Ex. C23, 25, 31, 38.)

90.     Medical personnel started discussing end of life care with S.S.  However, S.S.'s condition improved enough for him to be released from the infirmary on May 25, 2011.  (Wallinga Aff., ¶ 21, Ex. C18-19, 31; Weber Aff., ¶ 16, Ex. D.)

91.     S.S. was later admitted back to the infirmary on June 10, 2011, when his confusion further increased and his weakness prevented him from completing activities of daily living, including walking without falling.  (Wallinga Aff., ¶ 21, Ex. C20.)

92.     Medical personnel transferred S.S. to Avera McKennan hospital on June 13, 2011, where he died on June 15, 2011 from renal disease secondary to Hepatitis C. (Wallinga Aff., ¶ 21, Ex. C20, 27.)

Case Number: CIV. 12-4169
Defendants' Statement of Undisputed Material Facts

Dated this 16th day of September, 2013.

WOODS, FULLER, SHULTZ & SMITH P.C.

By /s/ James E. Moore
    James E. Moore
    Michele A. Munson
    PO Box 5027
    300 South Phillips Avenue, Suite 300
    Sioux Falls, SD 57117-5027
    Phone (605) 336-3890
    Fax (605) 339-3357
    Email james.moore@woodsfuller.com
    Email shelly.munson@woodsfuller.com
    Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of September, 2013, I electronically filed the foregoing Defendants' Statement of Undisputed Material Facts, using the CM/ECF system which will automatically send e-mail notification of such filing to the following:

Nicole J. Laughlin
Laughlin Law
400 North Main Avenue, Suite 205
Sioux Falls, South Dakota 57104

/s/ James E. Moore
One of the attorneys for Defendants